[No. 28053. *En Banc.* October 25, 1940.]

FRANK J. SPECKERT, *Appellant,* v. BUNKER HILL ARIZONA
MINING COMPANY *et al., Respondents.*[1]

[1]Reported in 106 P. (2d) 602.

*James R. Chambers*, for appellant.

*C. P. Brownlee* and *Copass & Hall*, for respondents.

MILLARD, J.—This action was brought to recover against defendant corporation and three of its directors $1,600.32, the amount of illegal assessments against plaintiff's shares of stock in defendant corporation, alleged to have been paid by plaintiff because of threat of defendants to sell plaintiff's shares of stock if plaintiff refused to pay the assessments. The defense pleaded was that the money was voluntarily paid with full knowledge of the facts.

The cause was tried to the court, which found that defendants did not at any time orally threaten to sell plaintiff's shares of stock, and that the written communications from defendants did not induce plaintiff to pay assessments through fear that his shares of stock would be sold for nonpayment of the assessments. The court concluded that the payments were made voluntarily by plaintiff with full knowledge of illegality of the assessments and not because of fear, coercion, duress, or compulsion; and that the action should be dismissed. From judgment entered in consonance therewith, plaintiff has appealed.

The trial court correctly found that the assessments against the shares of stock were illegal. Respondent corporation's articles of incorporation and by-laws disclose that the shares of stock issued by it to appellant were fully paid and nonassessable. It follows that the shares of stock represented by the certificates issued to appellant are nonassessable, and that respondent corporation was powerless to levy an assessment on those shares in violation of the contract between the corporation and appellant. The corporation did not, neither did its stockholders, directors, or any one else, have the right or authority to make the

assessments of which appellant complains, and those assessments were illegal. *Moore v. Los Lugos Gold Mines,* 172 Wash. 570, 21 P. (2d) 253.

■ The credibility of the witnesses and the weight to be given to their testimony were for the trial court, not this court. Unless the evidence preponderates against the finding that the payments of the assessments were made voluntarily by appellant with full knowledge of all the facts and not under any coercion, compulsion, or duress, we would not be warranted in disturbing the judgment. Those rules should be kept in mind when considering the evidence, which is as follows:

On March 6, 1937, appellant, who had been engaged in business in Seattle since 1925 as a stock broker specializing in shares of mining stock, owned, under his own name of Frank J. Speckert and an assumed name of L. B. Pennington, 136,577 shares of the common stock, which were fully paid and nonassessable, of the Bunker Hill Arizona Mining Company. On March 9, 1937, at the annual meeting of the stockholders of respondent corporation in Phoenix, Arizona, at which meeting there were represented in person by the president, vice-president, and three other stockholders, 68,773 shares of the capital stock of the corporation, and by proxy 1,569,875 shares, or a total of 1,638,648 shares out of a total of 2,886,679 shares, the following resolution was passed:

"WHEREAS an emergency exists, due to necessary funds being unavailable to meet immediate demands, and

"WHEREAS after due consideration by all stockholders present in person and by proxy, it is felt that an assessment of one cent ($.01) per share will raise sufficient funds to meet such demands,

"Now THEREFORE, BE IT RESOLVED and it is hereby ordered that an emergency does exist and the stockholders present in person and by proxy do hereby sub-

scribe to a one cent ($.01) per share assessment, payable one quarter ($.0025) at dates determined by financial requirements and we do recommend that such an assessment be endorsed."

The appellant and the individual respondents were not present at that meeting; however, appellant sent to E. R. Anderson and Harmon I. Lee, two stockholders who were present at the stockholders' meeting in Arizona, his two proxies; one signed Frank J. Speckert and the other signed L. B. Pennington, together with a letter dated March 6, 1937, addressed to E. R. Anderson. At this meeting, respondents A. H. Gunderson and Frederick E. Bolton were elected members of the board of directors.

On March 22, 1937, the board of directors of respondent corporation, including the three individual respondents, and E. R. Anderson, who was vice-president of the corporation, held a directors' meeting at which the following resolution was adopted:

"It was moved by Mr. Lamere, seconded by Mr. Anderson, that the Board proceed immediately to mail to all stockholders of record copy of the resolution passed by the stockholders at their Annual Meeting held March 9th, 10th, 11th, and 12th, 1937, in Phoenix, Arizona, authorizing a one cent ($.01) assessment on each share of issued stock, and that the Board declare such assessment to be payable in total on or before April 10th, or in 4 monthly payments, said payments to be due on May 10th, June 10th, and July 10th, 1937, with the provision that all stock on which said assessments have not been paid on said dates shall be declared null and void. Motion carried."

That portion of the resolution which declared that all stock on which the assessments had not been paid on the dates specified in the resolution would be declared null and void, was not communicated to appellant in letter of March 31, 1937, from respondent corporation.

On April 1, 1937, appellant received a letter dated March 31, 1937, from respondent corporation respecting the assessment made against the stock by the resolution of March 9, 1937, quoted above. That letter contains no threat respecting the assessment. After quoting the assessment resolution, the letter quotes, in part, as follows from the resolution of March 22, 1937:

"The time for making the payment of one cent assessment was taken up at the first meeting of the new Board, held Monday, March 22nd, and it was then directed that the assessment should be payable as per the following Board of Director's resolution:

" 'It was moved and duly seconded that the Board proceed immediately to mail to all stockholders of record copy of the resolution passed by the stockholders at their Annual Meeting held March 9th, 10th, 11th, and 12th at Phoenix, Arizona, authorizing a one cent ($.01) assessment on each share of issued stock, and that the Board declare such assessment to be payable in total on or before April 10th, or in four monthly payments of ¼¢ each, said payments to be due April 10th, May 10th, June 10th, and July 10th,

" 'Motion carried.' "

The letter further recites that,

"Most of the big stockholders have expressed their approval and indicated their willingness to comply promptly with the provisions, for they realize that this assessment will give the Company greater strength and stability in the minds of the public and all who contemplate taking stock or increasing their holdings. Hitherto many people have hesitated to buy stock because it was nonassessable no matter how acute the needs for immediate funds.

"Now, the first matter in which the stockholders are asked to cooperate is in helping to insure a full 100% payment of this assessment at as early a date as possible. This assessment had been discussed with many stockholders, large and small, before the meeting was held and general approval given. It was

passed by the unanimous vote of all stockholders in person or by proxy and over 50% of the total number of shares issued was represented.

"The payment of this assessment should not be burdensome to any of us. It takes only $10.00 to pay the full amount due on 1000 shares. Or if he so desires he can pay in quarters and that would only be $2.50 on each thousand shares each month for four months.

"This letter is being sent to you to request prompt compliance with the provisions in the resolution as quoted above. The funds derived from this call will be used to finish paying for the equipment and hastening the day of getting into production. So if you will please respond immediately by sending in at least the first installment of ¼¢, you will be aiding materially in pushing the good work along.

"With no desire to boast or to win special approbation but only to prove his confidence in the future of Bunker Hill, it is not out of place here to state that the undersigned, in addition to other substantial personal sums advanced during the past year, has within the past four weeks advanced $2700.00 which amount was applied on the machinery itself or towards its transportation to the mine. An emergency existed and someone had to dig up the money. He was glad that he was in a position where he could do it at the time. But each stockholder must do his part now in order to insure the greatest benefit from the money already advanced."

There is nothing in the letter suggestive of any intention or desire to sell or declare null and void the shares of stock of any stockholder in the event of his refusal to pay the assessment against the stock.

Appellant testified — his credibility was for the court — that, in the latter part of March, 1937, prior to transmittal of any written communications from respondent corporation, he had a conversation with E. R. Anderson, the corporation's vice-president, who informed appellant that latter would lose his shares of stock if he did not pay the assessment. The testi-

mony of appellant respecting the conversation is as follows:

"I asked him how the meeting came out. I said, 'I heard you levied an assessment.' He said, 'Yes, we levied one cent and we are going to make the payments four quarterly.' I said, 'What are you going to do? Are you going to sell this stock?' I said, 'I don't think it is legal. He said, 'We got an opinion of the Arizona authorities, where doing certain things in a certain way, an assessment would be all right.' I said, 'I think it is illegal. If I don't pay my assessment, will my stock be sold?' He said, 'Yes.' I said, 'If that is the case, I may have to pay the assessment or I am afraid that I will lose my stock.' I would not have paid it if they had not told me that my stock would be sold."

Appellant paid the assessments against his stock in four installments: April 10, 1937; May 10, 1937; June 10, 1937; and July 10, 1937.

Appellant further testified that, about March 20, 1937, prior to the time he paid any of the assessments, some stockholders informed him that an assessment had been voted. Appellant replied to his informants—appellant's credibility was for the trial court—that he did not see how that could be legally done; that he had the conversation, quoted above, with Mr. Anderson; and that he received "correspondence from the company before" he paid the assessments against his stock.

"Yes, I received those letters and then about—around maybe between the 5th and 10th of April—I went up to see him again about this. I said, 'I still don't think this right,' 'It isn't legal.' I said, 'Let us get this right; you're going to sell the stock of everybody who don't pay their assessments?' 'If that is the case I will have to pay it.' I sent checks in regularly. . . .

"As I said before, if I did not—had not made the

payments they would sell the stock and I could not take a chance of losing my stock. . . .

"I felt they were illegal, but I am not an attorney. I did not know whether I was right or he was right, but I knew I had to do one thing or the other—either take a chance of losing my stock or pay and save my stock. . . .

"And in addition he told me he took it up with the attorney general in Nevada—in Arizona to proceed along certain lines and the assessments would be legal."

By postal card dated April 3, 1937, appellant requested Mr. Anderson to mail notice and letter regarding the assessment to Mr. Lew G. Kay "and make note in office that you did." At that time, appellant owned many shares of stock of respondent corporation and those certificates stated on their face that the shares of stock were "fully paid and nonassessable."

May 5, 1937, nearly a month subsequent to the first payment and five days prior to the second payment made on the assessment by appellant, he received a letter from respondent corporation stating that the second installment was due from those who had elected to accept the installment plan of extricating the company from its distressing financial difficulties and that although

" . . . it should not be necessary, to send out this additional letter as a reminder to, and this benefit of, all who have not as yet paid in full; for we do not wish any stockholder who has stayed with the ship up till now to run the chance of losing his stock on account of so comparatively small an obligation, particularly when some of this stock may mean so much to its possessor in the near future. . . .

"Before closing this letter just another brief reference to the assessment. Don't forget! It is now that the assessment payment will be helpful. It is absolutely needed as was declared by the stockholders at their regular annual meeting. By the time all this assessment has been paid in, we hope that all our

financial needs will have been met and substantial progress will have been made toward getting into real production. Those who paid the low prices for stock should not hesitate to add this tiny additional amount, while those who paid high prices will, of course, feel the loss more keenly if they let their stock go for nothing and see the stock afterwards climbing in price. Please do not hesitate. You paid good money for your stock. Let us help you to keep it and get good returns out of it. Send us the assessment or the installment due on it so that it will reach this office, Monday, May 10, 1937. Don't let a single share of your valuable stock go on account of a delinquency of assessment. We have pulled together this far, let's all go together the rest of the way and finish the job."

On June 8, 1937, respondent corporation mailed a letter to its stockholders, stating:

"It is my duty to remind you that you are one of those stockholders who have thus far failed to make any payment on the one cent assessment ordered by the stockholders at their last annual meeting held March 9, 10, 11, and 12, of this year. As the third installment is due June 10, you should make every effort to send in a substantial amount at that time on your assessment, in order that there will be no need for the Board to take drastic action for its collection, although if it becomes necessary the Board will have no option in the course it will be necessary to take, since the penalty for failure to comply was also included in the original resolution passed by the stockholders and that is the same penalty exacted by all companies under the same circumstances. . . .

"You have carried your stock thus far. Do not let it slip from you now on account of one cent a share. The accompanying letter and the Harding report should convince you that we have a mine of unusual possibilities. Don't eliminate yourself from the right to participate when we are thereby under way and in production."

Under date of June 19, 1937, a form letter was addressed to the stockholders by respondent corpora-

tion urging that "if you have not already done so, send in the balance of your assessment . . . Don't jeopardize your stock!"

On June 26, 1937, a letter was mailed by respondent corporation reciting that:

"In checking over the list of Bunker Hill Stockholders, I find your name among those who have not yet paid the one cent assessment. . . .

"Whatever the reason for the delinquency you should make arrangements to pay the assessment in full immediately upon receipt of this letter. Otherwise it will become necessary for the Board of Directors to make arrangement for early confiscation of such an amount of your stock as is necessary to discharge the obligation on all the shares held by you."

A letter of respondent company dated July 21, 1937, sent to the stockholders, bears Seattle postmark of July 24 on envelope addressed to L. B. Pennington, c/o Frank J. Speckert. That letter urges, as follows, that the balance of the assessment due from each stockholder be remitted at once:

"If you happen to be one of those who has not already done so you should also send in the balance of your assessment immediately. On July 10, the fourth and last installment was due. No special notices were mailed at that time as it was assumed that every loyal stockholder would remember the date himself and so help save the expense involved in sending out these notices. We remind the stockholders again that this assessment saved the company from the rocks. It was the best legislation the stockholders ever passed for themselves. It has proved itself very popular as more and more stockholders realized its importance. Let us now make its performance as nearly 100 per cent perfect as possible."

Under date of September 7, 1937, a letter which was received by appellant September 9, 1937, was addressed to Frank J. Speckert and other stockholders reporting

encouragingly respecting the future of the mine. The letter reminds those, "of whom there are still a few," who have failed to pay the assessment against their stock that it must not be assumed that because

" . . . the delinquent stock has not yet been sold the directors do not intend to do so . . . It should be realized that the company does not want the stock but only the assessment money. However, the showdown will soon be necessary and then the Directors will have no choice except to advertise and sell the stock at public auction and devote the proceeds to the benefit of the company and all the stockholders who have paid.

"Again you are reminded that this assessment came as a godsend, through the medium of stockholders, whose foresight thus benefitted the company more than can be thoroughly realized by the majority It can hardly be that any stockholder, in the light of all that has been accomplished with the assessment money thus far collected and the present favorable status of the company affairs, would hesitate to discharge this small obligation immediately. As between paying and not paying the assessment (as far as the individual delinquent is concerned) it amounts to buying or not buying this stock at the ridiculously low price of only one cent a share, a far lower price than the stock has ever sold for and only one tenth of the lowest price that the company will sell any today; for just as surely as the assessment is not paid, so surely will the Board of Directors sell such stock in accordance with the resolution and proper legal procedure. The delinquents will then be on the outside looking in and possibly some day will be paying a higher price for stock which they practically threw away."

The same letter was sent to L. B. Pennington, c/o Frank J. Speckert.

On November 11, 1937, a copy of a purported affidavit of publication showing an amendment of the articles of incorporation of respondent corporation was incorporated in a circular letter entitled, "Special Mes-

sage To All Assessment Delinquents." Referring to the copy of the affidavit of publication the letter states that the publication

". . . proves the gradual approach to the final day of reckoning when no further extension can be granted for the payment of the one cent per share assessment. The Board is reluctant to take this final step as long as there is a chance of any little stockholders meeting the obligation. However, the day is near when no further postponement can be permitted. . . . The Board of Directors has given you every chance and is still pausing for you before taking the final unpleasant step."

On April 10, 1937, appellant wrote the corporation listing all of the stock certificates held in his own name or under his assumed name of L. B. Pennington. He stated that he owned 136,577 shares of the stock, and he enclosed a check in the amount of $341.44, which was the one-fourth payment due April 10, 1937, on the one cent assessment placed against the stock of the corporation. The letter does not disclose that he made the remittance because of any threats or that he was coerced into making the payment. May 10, 1937, in letter addressed by appellant to respondent corporation, a check in the amount of $341.44 covering the second quarterly payment due May 10, 1937, was enclosed. He requested that receipt be issued to Frank J. Speckert in the amount of $306.82, and that receipt be issued to L. B. Pennington in the amount of $34.62. Appellant, by letter dated June 10, 1937, transmitted check in the amount of $341.44 to respondent corporation in payment of the third quarterly installment due June 10, 1937, on assessment against the 136,577 shares of stock in the names of Frank J. Speckert and L. B. Pennington. On July 10, 1937, appellant transmitted by letter to respondent corporation his check covering the last quarterly payment due on assessments against

the shares of stock held under his own name and his assumed name.

On July 10, 1937, appellant wrote another letter to respondent corporation transmitting his check in the amount of $87.60 in payment of the assessment against 8,760 shares purchased that day by appellant in a brokerage office. This communication does not contain any language indicative of payment of assessments under duress or compulsion of any kind. August 4, 1937, appellant transmitted to respondent corporation his check in the amount of $43.10 to cover assessment against 4,310 shares of stock which appellant had just purchased. August 16, 1937, appellant sent his check in the amount of $50 to respondent corporation covering the assessment against 5,000 shares of stock appellant had just purchased. September 29, 1937, appellant paid to respondent corporation $28 covering assessment against 2,800 shares of stock which appellant had just purchased. October 25, 1937, appellant's check in the amount of $2.35 for payment of the assessment against 235 shares of stock he had just purchased was transmitted by appellant to respondent corporation. On the same date, he paid $20 additional covering the assessment against 2,000 shares of the stock he had purchased at that time from Julia Knudson. On December 8, 1937, appellant transmitted his check in the amount of $3.50 covering assessment against 350 shares of stock he purchased the day before from one W. J. Calder.

Of the amount of $1,600.32 which appellant insists was paid by him to respondent corporation under compulsion, the amount of $234.55 was paid on assessment against shares of stock purchased by him in the open market more than three months subsequent to the alleged compulsion. During July to December, inclusive, 1937, with knowledge of all the facts, appellant purchased the privilege of paying additional assess-

ments. He purchased 23,455 shares of stock and paid thereon $234.55 in assessments which he now seeks to recover. What his investment cost him, is not shown.

If he were endeavoring to recover solely the assessments amounting to $234.55 on the shares of stock he purchased from July to December 1937, with full knowledge of all the facts, he could hardly hope to maintain such an action. In effect, he would be deliberately buying a law suit, and the burden imposed on him to show that his conduct was justifiable he could not sustain. *Pitcher v. Lone Pine-Surprise etc. Co.,* 39 Wash. 608, 81 Pac. 1047.

■ "It is a universally recognized rule that money voluntarily paid under a claim of right to the payment, and with knowledge of the facts by the person making the payment, cannot be recovered back on the ground that the claim was illegal, or that there was no liability to pay in the first instance." 21 R. C. L. 141-142.

"A definition of voluntary payment is useful only to the extent that it gives the elements which must exist in order to make a payment voluntary. Each case must necessarily depend on its own peculiar facts. A rule which will furnish a safe guide in the determination of particular cases is that where a person pays an illegal demand, with a full knowledge of all the facts which render the demand illegal, without an immediate and urgent necessity therefor, or unless to release his person or property from detention, or to prevent an immediate seizure of his person or property, such payment is voluntary; and the fact that the person making the payment files a written protest at the time does not change its character. The question whether a payment is voluntary or involuntary is one of law where the facts are undisputed, but when the facts are in dispute it is for the jury to say whether the money was paid voluntarily or in consequence of compulsion or duress." 21 R. C. L. 143-144.

The general rule is that a voluntary payment can not be recovered back; but this, of course, has no applica-

tion where the payment was induced by fraud on the part of the payee.

"The general rule that a voluntary payment cannot be recovered back has no application where the payment was induced by fraud on the part of the payee, for, subject to the general rules as to what constitutes fraud, it is a well settled rule that, where a payment of money which the payee ought not to retain is induced by fraud and deceit, it may be recovered back by the payor, and if the fraud is the inducement for the payment, the rule applies although it is not the sole producing cause." 48 C. J. 753, § 311.

"Except where it is otherwise provided by statute, it is held by the great preponderance of adjudged cases that, where one under a mistake of law, or in ignorance of law, but with full knowledge of all the facts, and in the absence of fraud or improper conduct upon the part of the payee, voluntarily and without compulsion pays money on a demand not legally enforceable against him, he cannot recover it back; and the rule has been applied even to what the courts term 'hard cases,' and those in which it is against conscience for the payee to retain the payment. Where the rule stated obtains, no difference is ordinarily recognized, so far as concerns the right to recover voluntary payment, between ignorance and mistake of law. The rule is held to apply to corporations as well as to natural persons, and to be applicable in equity as well as in law. In a few jurisdictions, however, it has been held that a recovery of money paid under a pure mistake of law, or in ignorance of law, will be allowed where in equity and in good conscience the payee had no right to retain it; but where in conscience and justice no recovery should be had, the action does not lie." 48 C. J. 755, § 312.

This court is in accord with the tendency of the courts to modify and relax the old and established ideas as to the character of duress and coercion necessary in order to constitute a payment involuntary. *Duke v. Force*, 120 Wash. 599, 208 Pac. 67, 23 A. L. R.

1354. That is, payments made under what, for lack of a better term, may be deemed business compulsion are to be held to be involuntary payments; that, where a person is called upon either to suffer a serious business loss or to make a payment, such person may recover that payment, when it has been illegally collected, as having been made involuntarily; however, the facts in the case at bar do not bring appellant within that rule.

 The only misrepresentation alleged by appellant is that respondents represented a valid assessment had been passed. As to the contents of the resolution making the assessment, appellant had full information on or before April 1, 1937. At that time, he possessed many stock certificates which recited plainly the statement that they were fully paid and nonassessable. It is clear from the testimony of one witness, which is corroborated by the testimony of appellant, who, prior to payment of his assessment, purchased additional shares of stock, that appellant attended some of the meetings, prior to June 19, 1937, of respondent corporation's board of directors, during which meetings the matter of assessment and the manner in which collection of it was to be made were discussed; and that appellant assisted in composing some of the letters which he now insists coerced him into paying the assessments.

He intimated that he made a few changes in the letters, but "I had nothing to do with the general form of the letters." The first letter written, that of March 31, 1937, introduced in evidence by appellant and from which we quoted above, omitted from the copy of the resolution of which he now complains the language

" . . . with the provision that all stock on which said assessments have not been paid on said dates shall be declared null and void."

Prior to receipt of the letter of May 5, 1937, which

contains no threat of sale of stock in the event of nonpayment of the assessment, appellant paid his first installment of $341.44 without any objection other than the expression of his opinion that the assessment was illegal. The letter of June 8, 1937, which is clearly inapplicable to appellant, who made the April and May payments of $341.44 each, states that it is a reminder that "you are one of those stockholders who have thus far failed to make any payment on the one cent assessment." Appellant testified that this letter was never sent to him; that he called at the office and picked it up after carefully marking the date "6/9/37" in the upper right-hand corner for future reference. On June 11, 1937, appellant received a letter through the mail from the corporation, which letter was informative of the condition of the mine and contained no threat. Before he received this letter, appellant had transmitted his third installment of $341.44 to respondent corporation. The letter of June 26, 1937, stating that delinquent assessments must be paid in full and that "I find your name among those who have not yet paid the one cent assessment," was never sent to appellant, who testified that he picked the letter up at the office of the corporation. By that time, three of the four installments had been paid by appellant. Appellant testified that he dropped in frequently at the corporation's office to see whether Mr. Anderson was keeping his word that the stock was going to be sold and "I saw that letter and took it. I thought it would be good for me to file away." Counsel for respondents aptly observe that appellant was beginning to accumulate his own intimidation. On July 10, 1937, appellant paid in full the last installment covering the assessment on the shares of stock owned by him April 1, 1937, in his own name and in the assumed name of L. B. Pennington.

The communication obtained November 11, 1937, by appellant, who called at the office of respondent corporation to get it, can hardly be considered as evidence that appellant was coerced into making payments of the assessments. This letter, which contains copy of purported affidavit of publication of an amendment to the articles of incorporation, was obtained by appellant four months after he paid in full the last installment covering the assessment on his stock. It can not be contended successfully that these subsequent statements induced appellant to make the payments, the last installment of which was paid four months prior to his possession of the paper in question. Appellant testified that he got the communication of November 11, 1937, from Mr. Anderson in the office of the corporation; that "we were talking about this assessment and he was showing what had been done. I kept after him all of the time if he was going to sell that stock." It is clear that appellant was not talking about his own stock in view of the fact that his assessments were all paid. The reasonable inference from this testimony is that appellant was demanding action against the stockholders.

Dr. Gunderson, one of the respondents, testified that, prior to the communication of November 11, 1937, appellant helped Anderson write most of the letters to the stockholders respecting the assessments; that, at a number of the stockholders' meetings, appellant was present and criticized the board for not "putting more punch" into the letters; that "we said, 'If you can put more punch in the letters, we will have you help Anderson write the letters,' which he did;" that appellant was present March 8, 1938, at the annual stockholders' meeting of respondent corporation, and he did not vote against the resolution

" . . . that the stockholders represented at this

meeting in person or proxy approve the act or acts of each person and every member of the Board from the date of March 10th, 1937, to March 8th, 1938, and by vote was so approved."

Illegal payments coerced under duress or compulsion may be recovered, provided the compulsion supplies the motive for the payment sought to be recovered, and proceeds from the person against whom the action is brought. 21 R. C. L. 145; *Young v. Hoagland,* 212 Cal. 426, 298 Pac. 996, 75 A. L. R. 654.

The duress must have existed at the time the payment was made; "and a prior compulsion will not render the payment compulsory unless its influence continues up to the time of the payment." 48 C. J. 753, § 309.

If any threat was conveyed to appellant that his shares of stock would be sold in the event that he failed to pay the illegal assessment against the stock, it is manifest that that threat did not induce him to make the payment of the four installments. We are convinced, as was the trial court, that appellant made the payments voluntarily, and that he "did not pay this money knowing it was not an assessment, but it was a device to avoid assessment."

*Young v. Hoagland,* 212 Cal. 426, 298 Pac. 996, 75 A. L. R. 654, upon which appellant relies, is distinguishable on the facts from the case at bar. In the case cited, it was held that an illegal assessment which had been levied against corporation stock which the directors threatened to sell for nonpayment thereof might be paid by the owner without waiving the right to reimburse for the reason that the circumstances amounted to a collection of the assessment by coercion.

The Humboldt Oil Company had the power through its board of directors to levy assessments on its capital stock. Two valid assessments were levied prior to the

one out of which the controversy arose. The defendants, members of the board of directors of the Humboldt Oil Company, levied an assessment on its capital stock designated as assessment No. 3. On the same day, the stockholders held a meeting and elected a new board of directors to replace the members of the old board. On the same day, the new board of directors organized and passed a resolution rescinding the act of the old board levying assessment No. 3. The old board maintained, however, that the meeting of the stockholders was not legally called and refused to surrender their offices to the newly elected board of directors. It refused to recognize the order of the new board annuling assessment No. 3 and proceeded to take the necessary steps to enforce the same, and in this connection it threatened to sell any and all stock of the corporation upon which the assessment had not been paid. Some of the stockholders did not know whether the old board had been legally removed and the new board legally elected. Therefore, desirous of obviating the risk of having their stock sold for delinquent assessments, they paid the assessment on their stock and thereafter brought an action to recover the payment. The trial court found that the payment was made under compulsion and rendered judgment in favor of the plaintiff; which judgment was affirmed on appeal, the supreme court holding that the question of whether plaintiff in making the payment acted as a reasonably prudent person under the circumstances disclosed by the evidence, was a question of fact for the trial court, and that the evidence justified the trial court's conclusion that the payment was made under compulsion. The court said:

"In case they refused to pay the assessment, and it was finally held to be legal, they lost their stock. We question whether under such circumstances a reason-

ably prudent person would permit valuable stock owned by him to be thus jeopardized. Whether the stockholder acted as a reasonably prudent person would no doubt depend upon the facts and circumstances of each particular case. The question, therefore, in most instances would be one for the trial court or the jury. In the present action we find that the defendants were insisting that the old board of directors was the only legal body entitled to represent the corporation; that the new board was without any legal standing whatever and had no authority to rescind the resolution call for assessment No. 3. The defendants contend that they were honest and sincere in this belief, and ·in support of their belief in this respect they cite their action in contesting in the courts the claim of the new board of directors for control of the affairs of the corporation, and that they persisted in their convictions until the question of their status had been definitely determined by the appellate court. In the light of these facts it is hardly consistent for the defendants to now claim that the stockholders knew that the assessment was illegal, or even had reasonable grounds of believing it to be so, and, therefore, the payment of the same was voluntary on their part and cannot for that reason be recovered from the defendants. We are of the opinion that the evidence justified the conclusion of the trial court that the payments made by the stockholders were made under such circumstances as would entitle them to recover in this action the amounts so paid."

The evidence in the case at bar negatives the exercise of any compulsion upon appellant, who had in his possession at all times stock certificates stating that the stock was fully paid and nonassessable. Appellant knew that the assessment was illegal. In *Young v. Hoagland, supra,* the stockholders did not know that the assessment was illegal or have reasonable grounds for believing it to be so. The stockholders in the cited case were either compelled to pay the assessment or suffer their stock to be sold for nonpayment thereof.

In the case at bar, the evidence does not preponderate against the finding that respondents did not at any time orally threaten to sell appellant's shares of stock for nonpayment of assessment, and that respondents' letters and notices did not induce appellant to pay the assessment through fear of having his shares of stock sold.

In the latter part of the opinion in *Young v. Hoagland, supra,* it is stated that it might be conceded that, if the plaintiff and his assignors as stockholders of the corporation received the full benefits of the payments made by defendants to the creditors of the corporation, equity and good conscience would not permit them to recover, even if the payments made by them to the defendants were illegal. That portion of the opinion in the case cited also distinguishes that case from the case at bar.

In the instant case, the individual respondents have paid the assessment; in fact, the holders of 2,183,476 shares of stock out of a total of 2,886,679 shares have paid the assessment. The showing of cooperation between appellant and the corporation officials is clear. In the case cited, the plaintiff as a reasonably prudent person could rely on the legality of the assessment at the time it was paid. He and his assignors were the only ones who paid the assessment.

The judgment is affirmed.

ALL CONCUR.