**Lois S. BROCK and James J. Brock, Plaintiffs,**

v.

**ANDERSON–PRICHARD OIL CORPORATION, a Corporation, Defendants.**

**Civ. No. 5864.**

United States District Court
W. D. Oklahoma.

Oct. 31, 1955.

Hatcher & Bond, Chickasha, Okl., for plaintiff.

Embry, Crowe, Tolbert, Boxley & Johnson, Oklahoma City, Okl., for defendant.

WALLACE, District Judge.

The plaintiffs, Lois S. Brock and James J. Brock, citizens of Oklahoma, bring this action against the defendant, Anderson-Prichard Oil Corporation, a Delaware corporation (herein referred to as A-P) to recover for alleged breaches of a written contract between plaintiffs and A-P while plaintiffs (under the name of Consumers Oil Co.,) were acting as a wholesale distributor of A-P oil products. Plaintiffs urge they were charged more by A-P for gasoline than the amount provided in the agreement; and, in addition, that A-P encroached upon the area allotted to plaintiffs for exclusive distribution, by selling gasoline and other products in Verden and Minco, Oklahoma. In answering, A-P denies it charged the

plaintiffs more for gasoline than that provided for in the agreement between the parties; and, also alleges there was no violation of plaintiffs' exclusive distribution area inasmuch as Verden was exempt from the contract and A–P had the right to terminate the exclusive territory contract as to Minco.

After studying the submitted briefs and reviewing the introduced evidence, the court has concluded that plaintiffs have not established a right of recovery against A–P for regular or ethyl gasoline sold to plaintiffs pursuant to the written contract of May 26, 1947.

On the issue of overcharges, plaintiffs' basic complaint is that there was a breach of that portion of the agreement wherein A–P promised to furnish Challenge Gasoline "at the low price for 73–75 octane as shown in the Chicago Journal of Commerce, date of delivery."

The evidence indicates that from the inception of the agreement until December 23, 1949, plaintiffs were billed on the basis of the low of the "F.O.B. Group 3 Market". However, on December 23, 1949, on through the 22nd of January, 1952, the period complained of, plaintiffs were billed at the low of a new market designation appearing in the Journal as "Oklahoma (Oklahoma shipment)".[1]

Plaintiffs urge that because the "F.O.B. Group 3 Market" was used for almost three years, that such market designation became as much a part of the written agreement as if specifically referred to in the contract; and, that A–P could not thereafter use the higher market designation "Oklahoma (Oklahoma shipment)" when it made an appearance in the Journal and thereby in effect alter the terms of a written agreement without notice to or consent of the plaintiffs. However, although the low of the "F.O.B. Group 3" designation was applicable under the agreement in question so long as it alone appeared in the Journal giving the high-low of 73–75 octane, the use of such market designation was at all times subject to the additional provision in the agreement stating that: "It is understood and agreed that, "in posting the above prices on the various octane brackets as shown in the Chicago Journal of Commerce, should there be a change in specifications or in octane numbers or brackets, the prices for the products referred to or delivered to the buyer, shall be in accordance with the grade of material delivered and the bracket representing same in the Journal". The expert testimony is conclusive that when the new market designation "Oklahoma (Oklahoma shipment)" was printed in the Journal, that such constituted a change in "brackets" as commonly understood in the oil industry; and, inasmuch as plaintiffs were receiving petroleum products from Oklahoma for shipment in Oklahoma, the low of the "Oklahoma (Oklahoma shipment)" was the applicable quotation rather than the previously relied upon "F.O.B. Group 3" designation dealing with northern shipments. Obviously, the terms of a written contract cannot be altered by common trade practice and custom. However, in the instant case the issue is one of interpretation rather than alteration. Consequently, expert opinion is admissible to determine the trade meaning of technical words and thereby arrive at the true intent of the contracting parties.[2]

1. Although the invoices do not carry the exact figures shown by the market designation "Oklahoma (Oklahoma shipment)" the evidence is convincing that such quotation was used as a base from which certain allowances to plaintiffs were granted, thus throwing the amounts contained in the various invoices somewhere between the market designation "Oklahoma (Oklahoma shipment)" and the lower market designation "F.O.B. Group 3 Market". The invoices for the last two months in controversy directly correspond with the "Oklahoma (Oklahoma shipment)" low, inasmuch as during such brief period no deductions or fractional allowances were granted plaintiffs.

2. As stated in 15 Okla.Stat.1951 § 161: "Technical words are to be interpreted as usually understood by persons in the profession or business to which they relate, unless clearly used in a different

Although it may be that A-P dealt with plaintiffs in a hard-fisted business manner; nonetheless, there is no indication that A-P exceeded its legal right by failing to give plaintiffs notice of the bracket change. The wording of the contract itself established the rights of the parties; and, A-P had the contractual authority to price the gasoline in conformity with the terms of the contract without special and pointed notice to the plaintiffs of a change in brackets.

A recognizing of A-P's right to charge the low shown on the "Oklahoma (Oklahoma shipment)" quotation completely vitiates plaintiffs' asserted claim of overcharges as to *regular* gasoline sold to them; and, undermines a substantial portion of the asserted *ethyl* overcharges. However, plaintiffs also urge that in addition to the alleged departing from the applicable low cited in the Journal, that A-P committed a separate breach of contract in charging plaintiffs more than ¾¢ above regular for ethyl, beginning about July 1, 1950.[3] In reply A-P argues that such increase was permissible under the contract inasmuch as the octane count was raised.[4]

■■ Without passing upon whether the terms of the agreement permitted such increase, the evidence indicates that plaintiffs cannot at this time challenge such charges. Prior to the time A-P increased the price of ethyl to 1¢ over that of regular, specific notice was given plaintiffs.[5] As a result of such notice plaintiffs talked with A-P representatives about the proposed increase. After deliberate consideration plaintiffs chose to pay the requested price.

It is well settled that money voluntarily paid under a claim of right to the payment, and with knowledge of the facts by the person making the payment, cannot be recovered on the ground that there was no liability to pay in the first instance;[6] and, under the authorities it is equally clear that the plaintiffs' payments must be deemed *voluntary* in character.[7] These sums, voluntarily paid by

sense. * * *" As mentioned by Judge Phillips in Phillips Petroleum Co. v. Payne Oil Corporation, 10 Cir., 1944, 146 F.2d 546, 547: "* * * And where a written contract contains words or expressions of a technical nature employed in a particular business or industry, persons familiar with such business or industry may testify as to whether the words or expressions used have acquired a well-recognized meaning among those engaged in such business or industry, and if so, what it is, for the purpose of aiding the court in ascertaining the intentions of the parties to the contract."

3. The basis for this claim is paragraph two of the May 26, 1947 agreement wherein A-P stated: "We will furnish Challenge Ethyl Gasoline at ¾¢ per gallon over and above the low price of 73–75 octane as shown in the Chicago Journal of Commerce, date of delivery."

4. A-P relies upon paragraph four of the 1947 agreement which reads: "It is understood and agreed that, in posting the above prices on the various octane brackets as shown in the Chicago Journal of Commerce, *should there be a change in specifications or in octane numbers* or brackets, the prices for the products referred to or delivered to the buyer, shall be in accordance with the grade of material delivered and the bracket representing same in the Journal." (Emphasis supplied.)

5. On June 12, 1950, A-P sent written notice to plaintiffs (as well as to all other Oklahoma Jobbers and Distributors) that: "Effective July 1, we are improving the quality of our Ethyl gasoline at Cyril by raising the octane number to 90½ when loaded at the bulk plant. In addition to this, we are balancing out the distillation range and the vapor pressure for summer time operation so that the consumer will get maximum mileage and power, and freedom from knocking. Also, effective July 1, the price on this new Ethyl gasoline will be raised to 1¢ per gallon over and above the price of our "Q" gasoline, instead of ¾¢ over "Q" as in the past. Due to the increased manufacturing cost, practically all companies have already raised their Ethyl price to 1¢ or more above "Q", and we have delayed raising our price as long as we could * * *"

6. City of Wewoka v. Dunn, 1949, 201 Okl. 286, 205 P.2d 291; City Nat. Bank & Trust Co. v. Harvey, 1951, 205 Okl. 428, 238 P.2d 360.

7. As mentioned in William Sellers & Co., Inc. v. Clarke-Harrison, Inc., 1946, 354

plaintiffs with full knowledge of all pertinent facts, cannot now be the object of a suit pitched upon contractual breach.

■■ Neither does the evidence support plaintiffs' additional claims that A-P in selling petroleum products to Talkington Brothers of Verden, Oklahoma, and in directly supplying an A-P station in Minco, Oklahoma, constituted violations of the exclusive distributing franchise granted plaintiffs by A-P.

The agreement of May 26, 1947, although implying an exclusive district existed, did not specifically define the extent of such district.[8] Plaintiffs' strongest evidence that *all* of Verden fell within their exclusive control is found in a letter dated March 29, 1948, written to Talkington Brothers by an A-P Assistant to Sales Directors.[9] However, the postscript attached to the copy of this letter mailed to plaintiffs, [10] plus the parol evidence of persons in positions to know, indicate Talkington Brothers had been supplied directly by A-P with plaintiffs' knowledge and consent, and, that such station in Verden, although located within the general geographic location of plaintiffs' exclusive district, was expressly excepted from plaintiffs' territory. The evidence is convincing that at the time A-P wrote the letter in question, allegedly acknowledging a breach of its agreement with plaintiffs, the object of such letter was to aid plaintiffs by persuading Talkington Brothers to permit plaintiffs to service the Talkington account, which account previously for a considerable period of time had been serviced by A-P. Inasmuch as the writing bearing on this particular issue is indefinite in character, parol and other extrinsic evidence is admissible to resolve such uncertainty.

■ As to the alleged Minco violation of plaintiffs' exclusive distributorship, plaintiffs' claim must fail for several distinct reasons. In the first place, the written letter relied upon by plaintiffs does not of itself conclusively establish that the town of Minco was included in plaintiffs' territory.[11] In addition, and more controlling, the agreement of October 15, 1948 leasing to plaintiffs the Minco station, just purchased by A-P from Deep Rock, expressly gave A-P the authority, upon 10 days notice, to cancel the lease and take over the operation of the station. This lease agreement further provided that such agreement "supersedes and cancels any and all former agreements between the parties in respect to the subject matter hereof * * " In light of this agreement the court believes that the right of A-P to operate such station included the right to directly supply its station with petroleum products; and, it is uncontroverted that

Pa. 109, 46 A.2d 497, 499: " * * Money deliberately and voluntarily paid under a contract, with knowledge or means of knowledge of the material facts and without fraud or duress, even though paid under a mistake of law as to the interpretation of a contract cannot be recovered back. (Citing authorities.)" Also, see Speckert v. Bunker Hill Arizona Mining Co., 1940, 6 Wash.2d 39, 106 P.2d 602, 131 A.L.R. 125.

8. This implication arises from the language: "We will furnish you for your distribution *in the territory allotted* to you * * *" (Emphasis supplied.)

9. The first paragraph of such letter stated: "Our company is reviewing certain territorial franchises covering the distribution of Anderson-Prichard's products in an effort to straighten out some misunderstandings which have arisen in connection with the territories. Verden, Oklahoma originally was included in the territory allotted to the Consumers Oil Company of Chickasha, one of the oldest and largest of our distributors in the state, and it is now necessary that we protect these people for that area in line with our original understanding."

10. The postscript notation sent to Mrs. Brock read: "This refers to our conversation on Wednesday and your discussions with Mr. McClelland. It is hoped this will work out satisfactorily because we are anxious to do anything we can to improve your situation and we will be interested in learning how these people accept the situation. Suggest you have one of your men call on Talkington Brothers and discuss it fully and let's attempt to get it worked out satisfactorily."

11. The pertinent description reads "North on 81 *to* Minco". (Emphasis supplied.)

**584**

A-P cancelled plaintiffs' lease pursuant to proper notice. Moreover, after a pointed controversy over the relative rights of the parties under the station lease agreement a settlement as to the Minco station was reached. At the time of such settlement both parties clearly understood that A-P was to take over the operation of the station including the supplying of petroleum products.

The defendant is entitled to judgment. Within 15 days counsel should submit a journal entry which conforms with this opinion.